UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION

| | |
|---|---|
| HARPER/LOVE ADHESIVES CORPORATION, ) ) ) | |
| Plaintiff, ) ) | |
| ) | CAUSE NO.  2:07-CV-412 PS |
| v. ) ) | |
| DUANE VAN WITZENBERG, ) ) | |
| Defendant. ) | |

**OPINION AND ORDER**

Defendant Duane Van Witzenberg worked as a Technical Service Representative for Plaintiff Harper/Love Adhesives Corporation for a period of about four years.  Harper makes adhesives products for the corrugated box industry.  Van Witzenberg promoted Harper's products among its customers and helped troubleshoot customers' manufacturing processes.  When Van Witzenberg resigned his employment in March of 2006 to go to work for one of Harper's customers, he left on good terms.  But the company's feelings toward Van Witzenberg soured in March 2007 when they learned that he was planning to start up his own business producing and selling adhesive products and servicing box plants.  Van Witzenberg's start-up would be in competition with Harper's business, in violation of the two-year noncompete agreement that Van Witzenberg signed when he came to the company.  Harper seeks a preliminary injunction to stop Van Witzenberg from competing against it for the remainder of the two-year period, plus a tolling period.

I find that the noncompete agreement is too broad in its geographical scope, which renders it void.  However, the portion of the agreement relating to disclosure of confidential information is a distinct, severable, and enforceable provision.  Therefore, Van Witzenberg shall

be enjoined from disclosing or using confidential information that he acquired during his employment, but he shall not be enjoined from engaging in competitive business activity.

## I. BACKGROUND

Harper/Love Adhesives manufactures and sells industrial products that help improve the bonding ability of corrugated materials. The company sells its products to box plants throughout the United States, Canada, Latin America, and Europe. Duane Van Witzenberg went to work for Harper as a Technical Service Representative in March 2002. When he joined the company, he signed a noncompete and nondisclosure agreement. The noncompete clause provided:

> Employee further agrees that during the term of this Agreement and for two (2) years following the effective date of Employee's resignation from or termination of employment . . . Employee shall not . . . be involved in any way, directly or indirectly, solicit, sell, call upon or otherwise contact, own, manage, operate, join, control, be employed by, or participate in the ownership, management, operation, or control of, or provide consulting services or other advice to, or be connected in any manner with, any person or business which is competitive to the business of Harper, a customer of Harper in any capacity in which Employee establishes or assists in establishing for such customer a department, division or any other business unit which performs or attempts to perform the same or similar business function as that performed by Harper. As used herein the word "Customer" shall mean those plant locations of a business entity with which Harper does business at the time of Employee's resignation from or termination of employment with Harper.

(DE 2-3 at 3.) The noncompete clause provides that the two-year period would be tolled during any period in which Van Witzenberg violated the agreement, or any period of time required to litigate to enforce the agreement. (*Id.*)

The nondisclosure provision states: "Following Employee's resignation from or termination of employment with Harper, Employee shall not use **confidential information** or disclose **confidential information** to any person or entity for any reason." (*Id*. at 4.) Although the nondisclosure provision does not state the duration of the nondisclosure period, at the

2

preliminary injunction hearing, counsel for Plaintiff stipulated that the nondisclosure period was two years, the same as the noncompete agreement.

Initially, Van Witzenberg was based in Kansas City, Missouri providing technical support to Harpers's customers in Oklahoma, Kansas, and Missouri, and on an as-needed basis for Harper customers throughout the United States.  He was later transferred to Indiana, and eventually began servicing Harper's clients in Indiana, Illinois, Michigan, Wisconsin, and Iowa, though he could still be called on to service plants nationwide on an as-needed basis.  Harper asserts that in addition to his regular territory, Van Witzenberg also performed work for Harper in at least six other states.

Prior to working for Harper, Van Witzenberg had 17 years of experience working in the corrugated box industry, including eleven years as a corrugated line supervisor.  One former manager at General Packaging wrote him a recommendation letter in 2002 that stated, "I have been in the business for 30 years with Weyerhaeuser and Georgia Pacific, and honestly have not seen or been around a person of Duane's ability to troubleshoot, understand and correct a corrugator operation."  (Def. Tab B at 2.)  William Gerard, Van Witzenberg's supervisor at Harper, concurred.  He testified that Van Witzenberg was an "excellent employee" and had a particular talent for running corrugating operations and serving as a troubleshooter when equipment malfunctioned.

Harper shares all technical and competitive information with all of its employees, including product formulas, pricing, and customer lists.  Van Witzenberg attended training in North Carolina when he first joined the company, and he had ongoing training and access to information about industry developments.  Gerard testified that while Van Witzenberg came to

3

the company with substantial knowledge about the corrugated industry, he was exposed to many more plants and more troubleshooting opportunities while at Harper, and therefore his knowledge and expertise would have grown substantially.

In June 2005, Van Witzenberg resigned from Harper in order to go to work for a customer, Georgia-Pacific ("GP").  The new employment was not a violation of the noncompete agreement.  But Gerard told Van Witzenberg that he would not receive his year-end bonus if he resigned before June 30, the end of the fiscal year.  Because GP wanted Van Witzenberg right away, Harper agreed to keep him on the payroll until June 30, but let him leave early to start working at GP.  Van Witzenberg had only been working at GP for a few days when, on June 30, Gerard asked him to come back to work at Harper.  Van Witzenberg agreed, and because his resignation had not yet become effective, he simply cancelled the resignation and returned to work at Harper.  Van Witzenberg admits that he never left the Harper payroll.

Van Witzenberg tendered his resignation again in March 2006, this time for good.  He spent a few months working at corrugated manufacturers but then left in March of 2007 to start a new business, Performance Adhesives. Van Witzenberg testified that he believed his two-year noncompete period expired in June 2007 – two years after he first resigned from Harper to work for GP.

Harper alleges that Van Witzenberg violated the noncompete agreement by "soliciting clients and prospective clients of Harper, directly or indirectly . . . ." (Compl. ¶ 25.)  For instance, Harper claims that in August 2007, Van Witzenberg solicited and acquired the business of ARVCO Industries, resulting in a loss to Harper of $65,000 worth of sales.  Van Witzenberg had not been assigned to ARVCO when he worked at Harper.  Rather, he testified that he learned

4

about the company through an industry magazine containing a directory of all box plants in the United States, which he purchased as a solicitation tool.

The Complaint alleges that Van Witzenberg also called on Ideal Box, Corrugated Supply, International Paper ("IP") box plants in Chicago, Illinois and Cedarburg, Wisconsin, and a Weyerhauser box plaint in Lincoln, Illinois. Van Witzenberg acknowledged that he sold products and service to IP-Chicago and spent one day providing service to IP-Cedarburg. But he denied selling products or service to Ideal Box and Weyerhauser. Gerard admitted that Harper lost International Paper as a customer in 2006, prior to the advent of Van Witzenberg's business. Also, Harper's sales to Ideal Box, Corrugated Supply, and Weyerhauser diminished significantly before Van Witzenberg opened his business. (Pl.'s Ex. 20.)

According to the Complaint, there are 571 box plants in the United States of which 181 are current customers of Harper. Gerard testified that the other 383 box makers are "prospects," meaning that they are potential future customers. Harper's position is that the noncompete agreement prevents Van Witzenberg from contacting not only customers, but potential customers of Harper as well.

In response to Harper's discovery requests, Van Witzenberg produced a number of proprietary materials from Harper. They had been stored in his garage. The materials include customer lists, reports and correspondence pertaining to service calls on plants, and expense reports. (Pl.'s Ex. 3.) But all of these materials were from a long ago period of time – 2001-2004. Van Witzenberg credibly testified that he found these materials in a box that he had packed when he moved from Missouri to Indiana, and which he did not unpack until Harper served document requests in this litigation that sought such materials. Van Witzenberg admitted

5

that much of the information in his possession, including cost analyses and pricing sheets, are not publicly available. But he stated that he has not used any confidential information to solicit business for Performance Adhesives, and instead has relied on his own knowledge of the corrugated industry.

## II. DISCUSSION

In a diversity case, federal law governs the standard for the grant or denial of a preliminary injunction. *Gen. Elec. Co. v. Am. Wholesale Co.*, 235 F.2d 606, 608 (7th Cir. 1956) ("The propriety of a preliminary injunction, of course, is to be determined by the rules and decisions of federal courts."). In determining whether a preliminary injunction is warranted, a court must consider whether the party seeking the injunction has demonstrated that "1) it has a reasonable likelihood of success on the merits; 2) no adequate remedy at law exists; 3) it will suffer irreparable harm if it is denied; 4) the irreparable harm the party will suffer without injunctive relief is greater than the harm the opposing party will suffer if the preliminary injunction is granted; and 5) the preliminary injunction will not harm the public interest." *Linnemeir v. Bd. of Trs. of Purdue Univ.*, 260 F.3d 757, 761 (7th Cir. 2001).

**A. Noncompete Agreement**

The first issue is whether Harper is entitled to a preliminary injunction that would stop Van Witzenberg from competing against Harper for a period of two years. The most serious hurdle for Harper is the threshold issue of whether it has a reasonable likelihood of prevailing on the merits. The "likelihood of success" analysis involves a two-step process: first, the court must determine if the Plaintiff has *any* chance of winning. If the plaintiff has some chance of winning, then the court should evaluate what those chances are as balanced by the harm that will result if

6

it guesses wrong.  *AM Gen'l Corp. v. DaimlerChrysler Corp.*, 311 F.3d 796, 804 (7th Cir. 2002).

At the outset, I will address Van Witzenberg's argument that Harper cannot prevail on the merits because he never violated the terms of the agreement.  This argument relies on his assertion that he had two distinct terms of employment with Harper, the first from 2002 to June 2005, and the second from July 2005 until March 2006.  Recall that Van Witzenberg worked for Georgia-Pacific for two weeks in June 2005.  He claims that he never signed a second noncompete when he "rejoined" Harper after his two week stint at GP.  This argument is frivolous.  Van Witzenberg never left Harper's payroll;  and his resignation was effective June 30, 2005 which he revoked on that date.  At most, Van Witzenberg can show that in late June 2005, he was working at Georgia-Pacific and was drawing a paycheck from Georgia-Pacific.  But the fact that he was working for GP does not mean that he wasn't simultaneously still employed with Harper. In sum, there was no gap in his service and the noncompete that he signed when he first joined Harper remained in effect until he finally resigned in March 2006.

The critical issue to Plaintiff's likelihood of success is whether the noncompete provision would be upheld under North Carolina law, which governs the agreement.  (DE 2-3 at 8.)  Under the covenant, Van Witzenberg was forbidden for a period of two years from soliciting, selling, contacting, owning, managing, or working for "any business which is competitive to the business of Harper," or, as best the Court understands it, for any customer of Harper intending to establish a business unit which would compete with Harper.  The covenant does not contain any geographic limitation.  Harper insists that the provision is necessarily broad given both the relatively small number of corrugated plants nationwide – if one could call 571 a small number –

7

and the fact that Van Witzenberg could be called on to serve customers nationwide.

In North Carolina, restraints on trade such as non-competition agreements are disfavored. *Farr Assocs., Inc. v. Baskin*, 530 S.E.2d 878, 881 (N.C. Ct. App. 2000). But a noncompetition clause is enforceable when the party urging enforcement can show that the covenant is: 1) in writing; 2) reasonable as to terms, time, and territory; 3) made a part of the employment contract; 4) based on valuable consideration; and 5) not against public policy. *Triangle Leasing Co., Inc. v. McMahon*, 393 S.E.2d 854, 857 (N.C. 1990). The only factor at issue here is whether the covenant is reasonable in its terms, duration, and geographic scope.

When evaluating the reasonableness of a covenant's time and territory requirements, North Carolina courts consider six factors: 1) the area, or scope, of the restriction; 2) the area assigned to the employee; 3) the area where the employee actually worked or was subject to work; 4) the area in which the employer operated; 5) the nature of the business involved; and 6) the nature of the employee's duty and his knowledge of the employer's business operation. *Hartman v. W.H. Odell and Assocs.*, 450 S.E.2d 912, 917 (N.C. Ct. App. 1994) (citing *Clyde Rudd & Assocs., Inc. v. Taylor*, 225 S.E.2d 602, 605 (1976), *cert. denied*, 290 N.C. 659 (1976)). North Carolina courts balance the time and territory elements, "such that '[a] longer period of time is acceptable where the geographic restriction is relatively small, and *vice versa*.'" *Okuma America Corp. v. Bowers*, 638 S.E.2d 617, 620 (N.C. Ct. App. 2007) (quoting *Farr*, 530 S.E.2d at 880).

When appellate courts make several factors relevant to a legal issue, a patchwork tends to result. The North Carolina law on the reasonableness of noncompete agreements is no exception. The cases are all over the board. Although the covenant at issue here presents a close

8

case, analyzing it against the factors set out above, I conclude that it is unreasonable in its scope.

As to the first factor, the restriction contains no geographical limits. Since it forbids Van Witzenberg from being in any way involved with a "business which is competitive to the business of Harper," the scope of the covenant is at least as wide as those places where Harper competes for customers – in other words, the entire Western Hemisphere plus Europe. *See Okuma*, 638 S.E.2d at 621 (noting that while covenant limited to "areas in which [employer] does business" was a client-based limitation rather than geographical, "because [the employer] operates throughout both North and South America, the geographic effect of the restriction is quite broad").

Harper correctly points out that the North Carolina Supreme Court has upheld a restrictive covenant that extended nationwide. *Harwell Enters., Inc. v. Heim*, 173 S.E.2d 316, 320 (N.C. 1970) (two-year nationwide covenant valid to protect plaintiff's silk screen process information); *see also Triangle Leasing Co. v. McMahon*, 393 S.E.2d 854, 857 (N.C. 1990) (upholding two-year restriction forbidding employee from soliciting business from employer's active customers in any state or territory in which the employer conducted business). However, the Court also struck down a client-based restriction that did not contain any geographical limitations. *See Prof'l Liab. Consultants, Inc. v. Todd*, 478 S.E.2d 201 (N.C. 1996) (holding that five-year restriction against contacting any current or recent former client was unenforceable).

On the one hand, the North Carolina Court of Appeals has upheld a covenant containing no geographical restriction, where the plaintiff was a national company and the duration of the noncompete was a mere six months. *Market America, Inc. v. Christman-Orth*, 520 S.E2d 570, 578 (N.C. Ct. App. 1999). On the other hand, it refused to uphold a restriction under which an

9

employee was not only barred from competing at all within a multi-state region, but would be required to pay his former employer 30% to 40% of all fees he earned for competitive work he did anywhere in the world outside that region.  *Hartman*, 450 S.E.2d at 918;  *see also American Hot Rod Assoc., Inc. v. Carrier*, 500 F.2d 1269 (4th Cir. 1974) (invalidating a non-competition agreement with no geographical limits and a five-year term).  In *Hartman*, the Court also struck other multi-state restrictions in the employment agreement, holding that the former employer had not shown that its business in some of the states was substantial enough to justify a statewide ban.  *Id*.  And in *Farr*, the Court of Appeals determined that a covenant restricting an employee from competing with the company's current and recent clients for a period of three years was unreasonable given the company's international reach.  530 S.E.2d at 882.  Noting that the employer in *Farr* had approximately 461 offices in 41 states and four foreign countries, the court observed:

> The covenant in question prevents Mr. Baskin from working for *all* of Farr's current or recent clients, regardless of where the client is located, whether he had any contact with them, or whether he even knew about them.  Although Mr. Baskin is not prevented from working in any particular locale, he is precluded from working with a number of businesses in a large number of cities throughout the world.

*Id*.

By itself, the two-year period in the covenant at issue here appears reasonable.  But considering it in combination with the broad geographic scope, it is relatively long.  *See Static Control Components, Inc. v. Darkprint Imaging, Inc.*, 240 F. Supp. 2d 465, 474 (M.D.N.C. 2002) (comparing *American Hot Rod* and *Market America*; noting that two years is "shorter than that previously deemed under North Carolina law to be per se excessive but longer than that previously deemed appropriate for a global agreement").  And in addition to its geographic

10

breadth, the covenant prohibits a wide range of activity. Not only does the agreement forbid Van Witzenberg from soliciting business on behalf of a competitor, it also prohibits him from "directly or indirectly" selling, calling upon, joining, controlling, working for, consulting for, or owning or participating in the ownership of, a competitor. Yet, in *VisionAIR v. James*, 606 S.E.2d 359, 362-63 (N.C. Ct. App. 2004), the court struck down a similar covenant, observing that under the agreement, the employee would have been prohibited from doing "even wholly unrelated work" at a competitor or from even holding an interest in a mutual fund that invested in a competitor.

Further, by forbidding Van Witzenberg from having any involvement with a competitor, the restriction bars him not just from contacting Harper's customers, but from soliciting anyone who buys adhesives in places where Harper sells them. As one of Harper's executives testified, Harper views all box plants in its sales territories as either customers or prospects. Thus, inasmuch as Harper sells to locations throughout the Western Hemisphere, the noncompete agreement would completely bar Van Witzenberg from soliciting any box plants in this half of the world.

As to the second, third, and fourth *Hartman* factors, Van Witzenberg was assigned to two different regions during his time at Harper; first, he serviced the Missouri, Oklahoma, and Kansas area, and then he handled Michigan, Wisconsin, Indiana, Illinois, and Iowa. Although Harper insists that Van Witzenberg could be called to any plant nationwide as needed, the record only indicates that he visited six states outside of these primary areas. So in his tenure with Harper, Van Witzenberg only worked in 14 of the 37 states that Harper services. (Pl.'s Ex. 18.) Thus, while Harper has demonstrated that it does business nationwide, the evidence

11

demonstrates that Van Witzenberg performed work in only a fraction of Harper's overall sales territory. The noncompete in this case really amounts to a client-based limitation. But this type of noncompete has been rejected in North Carolina if it extends beyond contacts that the employee made while he was employed by the party trying to enforce the covenant. *See Farr*, 530 S.E.2d at 883. This covenant is even more draconian because not only would it prevent Van Witzenberg from contacting customers that he had called on, but other customers of Harper that he had not. Then to make matters worse, according to Harper, Van Witzenberg can't even contact the other 383 potential customers who are in the corrugated industry but who have no existing relationship with Harper whatsoever. And then it gets worse still. The record does not indicate that Van Witzenberg was ever required to perform service to customers outside of the United States, yet the covenant would also forbid him from having any role in any box plant anywhere in the Western Hemisphere. It is these types of restrictions that make the North Carolina courts look askance at covenants not to compete.

  The fifth factor – the nature of the business – favors Harper. The corrugated adhesives market is highly competitive and specialized, and because of the relatively small number of potential customers, it is necessarily geographically broad. But the sixth factor – the nature of Van Witzenberg's role with the company and his knowledge of the company – tends to cancel this out. Van Witzenberg was a technical service representative; though Harper operated with an "open play book" and gave him some training, there was no showing that he had access to trade secrets or high-level technical or strategic information. *Compare Okuma*, 638 S.E.2d at 621 (holding that a six-month client-based restriction covering North and South America was not unenforceable as a matter of law, where employee was a top executive whose participation "in

12

the most critical and strategic decisions made by the company" made the broad client-based restriction necessary), *with Farr*, 530 S.E.2d at 882 (invalidating three-year covenant forbidding employee from contacting any company client; employee was a consultant who worked with a relatively small number of clients).

The thrust of Harper's argument is not that Van Witzenberg might use his knowledge of Harper's secret formulas to replicate its products or use high-level strategic information to the company's disadvantage.  Rather, the gist of the Complaint is that Van Witzenberg is leveraging the relationships he formed with Harper customers and prospects to lure business away from Harper and to his new venture.  (Compl. ¶¶ 12, 25-35.)  But if the company's primary concern is the employee's knowledge of the customers, then the noncompete should be limited to areas where the employee actually made contacts when he was employed there.  As the Court in *Farr* stated, although an employer has a legitimate interest in preventing departing employees from misappropriating clients, "a client-based limitation cannot extend beyond contacts made during the period of the employee's employment."  530 S.E.2d at 883.  The restrictions in this case go much further.

Harper simply has not presented an adequate justification under North Carolina law for prohibiting Van Witzenberg from engaging in any direct or indirect act of competition against Harper anywhere in the Western Hemisphere.  It is neither here nor there that in fact Van Witzenberg has only solicited current or former Harper clients within the states that formed part of his territory while at Harper.  This is because North Carolina law prohibits Courts from redrafting or "blue penciling" covenants to make them more narrow.  As one North Carolina court succinctly put it: "'The courts will not rewrite a contract if it is too broad but will simply

13

not enforce it. . . . If the contract is separable, however, and one part is reasonable the courts will enforce the reasonable provision.'" *Hartman*, 450 S.E.2d at 920 (quoting *Whittaker Gen'l Med. Corp. v. Daniel*, 379 S.E.2d 824, 828 (1989)). The noncompete provision at issue here is unsalvageable. Therefore, Harper does not have a greater than negligible chance of prevailing on the merits, and this ends the analysis.

**B. Nondisclosure Agreement**

In contrast, the nondisclosure agreement is a severable, stand-alone provision that is enforceable. That provision defines "confidential information" as:

> any trade secrets or other information which is not generally known to the public or recognized as a standard practice in Harper's industry, including, but not limited to, customer lists, supplier lists, formulae, methods, practices, procedures, plans, patterns, devices, machines, appliances, products, processes, programs, techniques, compilations of information, and inventions, as well as information related to research and development, products and services, technology, accounting, administrative, and other internal business records, marketing and pricing data, plans, strategies and existing and prospective customers, including the status of negotiations and relationships with customers.

(DE 2-3 at 3.) That list apparently not being sufficiently exhaustive, the agreement goes on to state that information about customer preferences, the terms and conditions upon which Harper deals with its customers, some third-party proprietary information, and research development information also constitute "confidential information." The provision forbids Van Witzenberg from using or disclosing confidential information after his resignation from the company. Although the provision does not say how long the nondisclosure period shall last, Harper stipulated at the preliminary injunction hearing that the confidentiality provision must also be limited to a two-year period.

During the course of discovery, Van Witzenberg produced five videotapes and a CD

14

containing customer lists, reports and correspondence pertaining to service calls on plants, and expense reports from the 2001-2004 period, when he was assigned to the territory encompassing Missouri, Oklahoma, and Kansas.  He testified he had not seen the materials from the time that he packed them in his move from Kansas City several years ago until the time he dug them out in a search for responsive documents.  The nondisclosure agreement prevents Van Witzenberg from disclosing many, if not all, of the documents on the CD.  Thus, Harper has a high likelihood of success on the merits of this claim.  Although Harper has not clearly shown that disclosure would result in irreparable harm, the balancing of harms strongly favors Harper given that Van Witzenberg evidently has no interest in using this information anyway.  Therefore, Van Witzenberg shall be ordered to refrain from disclosing any of Harper's confidential information that remains in his possession, and to return all such information to Harper or demonstrate that it has been destroyed.

**C.  Remainder of Claims**

When a district judge has "obtained in the preliminary hearing all the facts that he believes pertinent to deciding which party is in the right [and] is able to make up his mind that the party seeking the injunction has no legal ground for his case, he should not only deny the injunction, he should dismiss the suit; for he knows how it will come out." *Curtis 1000, Inc. v. Suess*, 24 F.3d 941, 945 (7th Cir. 1994).  Thus, for purposes of streamlining the case, the court may give notice to the parties of his intent to merge the preliminary injunction phase with the trial phase and enter final judgment.  *Id*.

Given the Court's conclusion that the noncompete provision of the agreement is unenforceable and that the nondisclosure provision is enforceable, it seems that the lion's share

15

of Plaintiff's claims have been resolved.  However, Plaintiff may intend to prove that Van Witzenberg breached the nondisclosure provision, and that it suffered damages as a result of such breach.  For his part, Defendant may wish to press his counterclaim for past due bonuses, which was not fully addressed at the preliminary injunction hearing.  Therefore, I conclude that it would be premature to merge the preliminary injunction phase with the trial phase and dismiss this case.  The parties are ordered to provide within 10 days a status report outlining the remainder of their claims and defenses, or advising the Court that the matter should be dismissed.

### III. CONCLUSION

For the foregoing reasons, Plaintiff's request for a preliminary injunction (DE 1) is **GRANTED IN PART**.  Van Witzenberg is hereby **ORDERED** not to disclose or make known to any person or entity, or to otherwise use, any confidential information or trade secrets that Van Witzenberg acquired during his employment with Harper.  Van Witzenberg is further **ORDERED** to return any and all confidential information to Harper and/or provide proof that the same has been destroyed and/or purged.  "Confidential information" includes:  customer lists, supplier lists, formulae, methods, practices, procedures, plans, or patterns; information about devices, machines, appliances, products, processes, programs, inventions, or techniques that are proprietary to Harper; compilations of information; information related to research and development, products and services, technology, accounting, administrative functions; internal business records; marketing and pricing data, plans, and strategies; information about existing and prospective customers, including the status of negotiations and relationships with customers or the identification and preferences of customers; and third-party proprietary information.

The remainder of Plaintiff's motion for a preliminary injunction is **DENIED**. Defendant's motion to file a sur-reply (DE 33) is **DENIED AS MOOT**. The parties are **ORDERED** to provide a status report within 10 days that answers whether this case should be dismissed, and if not, what remains for trial.

**SO ORDERED**.

ENTERED: March 14, 2008

s/ Philip P. Simon<br>
PHILIP P. SIMON, JUDGE<br>
UNITED STATES DISTRICT COURT